**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| STAN SCHIFF, M.D., Ph.D., on behalf of himself and a class of similarly situated providers,<br><br>Respondent/Cross-Petitioner,<br><br>v.<br><br>LIBERTY MUTUAL FIRE INSURANCE CO. and LIBERTY MUTUAL INSURANCE COMPANY, foreign insurance companies,<br><br>Petitioners/Cross-Respondents. | DIVISION ONE<br><br>No. 82554-2-I (consol. with No. 82558-5-I)<br><br>PUBLISHED OPINION |

DWYER, J. — Washington's insurance code and regulations prohibit persons engaged in the business of insurance from engaging in unfair methods of competition or in unfair or deceptive acts or practices in that business. In our state's Consumer Protection Act[1] (CPA), our legislature expressly provided that violations of that prohibition subject insurers to liability pursuant to the consumer protection law. In the first party insurance context, we recently held that an insurer engages in an unfair practice in violation of the insurance regulations and the CPA by failing to conduct an individualized assessment of the reasonableness of a medical provider's bill and, instead, relying solely on a mechanistic, formulaic approach that compares charges within a geographic area to determine if the amounts billed are reasonable.

_____

[1] Ch. 19.86 RCW.

No. 82554-2-I/2

Here, the insurer engaged in the precise conduct that we have recently determined constitutes an unfair practice. Because the plaintiff challenging the lawfulness of the insurer's conduct has additionally established the other elements of a CPA claim, we conclude that he is entitled to entry of summary judgment on that claim.

In addition, we reject the insurer's assertion that it is exempt from liability for this conduct pursuant to the CPA's exemption provision. Such a reading of that provision would contravene our legislature's clear intent that an insurer is subject to CPA liability for actions prohibited by the insurance code and regulations. Moreover, because there is no "good faith" defense to the claim presented here, we additionally reject the insurer's contention that such a defense shields it from liability. Accordingly, we conclude that the insurer is subject to CPA liability for the unfair practice challenged here.

I

Stan Schiff, M.D., Ph.D., is a neurologist who practices in Shoreline. Schiff sometimes treats patients insured by Liberty Mutual personal injury protection (PIP) and "med pay" automobile insurance policies.[2] Schiff submitted to Liberty Mutual two bills for treating its insureds, in September 2015 and October 2016, that the insurer did not pay in full. Instead, Liberty Mutual, pursuant to the applicable insurance policy language, determined that the full amount of the charges was not "reasonable." To make this determination, the insurer relied solely on the FAIR Health database, a computer database that

---

[2] The appellants/cross-respondents Liberty Mutual Fire Insurance Company and Liberty Mutual Insurance Company are herein referred to collectively as Liberty Mutual.

2

No. 82554-2-I/3

compares billed charges to the charges submitted by other medical providers within the same broad geographical area. Because the charges billed by Schiff exceeded the 80th percentile of charges in the FAIR Health database for the same services within the same geographical area, Liberty Mutual reduced its payment on the bills to the 80th percentile amount (the 80th percentile practice).[3]

In May 2017, Schiff filed a class action lawsuit against Liberty Mutual, asserting that the insurer's 80th percentile practice violates provisions of Washington's insurance code and insurance regulations defining unfair claims settlement practices. Schiff further asserted that the 80th percentile practice constitutes an unfair act pursuant to the CPA. In the complaint, Schiff requested certification of the class, an award of actual damages to be established at trial, an award of treble damages pursuant to the CPA, and an award of attorney fees and costs, prejudgment interest, and reasonable litigation expenses. Schiff subsequently amended his complaint to additionally request that the trial court enjoin Liberty Mutual from continuing to reduce the amount paid on medical providers' bills using the 80th percentile practice.

In January 2020, the trial court ruled that an Oregon class action settlement agreement and the judgment approving that agreement (the Froeber settlement) barred Schiff from asserting the class action and injunctive relief claims pleaded in his complaint. See Froeber v. Liberty Mut. Ins. Co., 193 P.3d 999 (Or. Ct. App. 2008); Froeber v. Liberty Mutual Ins. Co., 2003 WL 25854983 (Circuit Court of Oregon, Marion County). However, the trial court ruled that the

---

[3] Liberty Mutual acknowledges in its briefing to us that the 80th percentile practice is its sole means of determining whether a medical provider's bill is "reasonable."

3

No. 82554-2-I/4

<u>Froeber</u> settlement does not bar Schiff from pursuing the individual CPA claim for monetary damages based on the September 2015 and October 2016 billing incidents. Thus, the trial court dismissed Schiff's "class action claims and injunctive claims" and denied Schiff's motion for class certification.

Schiff thereafter filed a motion for partial summary judgment on CPA liability, asserting that Liberty Mutual's 80th percentile practice violates the CPA as a matter of law pursuant to our decision in <u>Folweiler Chiropractic, PS v. Am. Fam. Ins. Co.</u>, 5 Wn. App. 2d 829, 429 P.3d 813 (2018). In its response in opposition to Schiff's motion, Liberty Mutual asserted that, even if the challenged practice violates the CPA, Schiff's claim is barred by so-called "safe harbor"[4] and "good faith" affirmative defenses. In February 2020, the trial court ruled that it was undisputed, on the current record, "that Liberty Mutual did not do the kind of individualized investigation" required by our <u>Folweiler</u> decision. The trial court nevertheless denied Schiff's motion for partial summary judgment, ruling that disputed facts remained regarding the defenses asserted by Liberty Mutual.

In June 2020, in response to Liberty Mutual's motion to dismiss Schiff's third amended complaint, the trial court again ruled that the <u>Froeber</u> settlement bars Schiff from asserting CPA class action and injunctive relief claims. The trial court thus ruled, for a second time, that Schiff can pursue only his individual CPA claims for monetary relief allegedly sustained as a result of the September 2015 and October 2016 billing incidents. The trial court denied Liberty Mutual's motion for summary judgment regarding Schiff's individual claims.

---

[4] Liberty Mutual refers to the CPA's regulated industries exemption, RCW 19.86.170, as providing a "safe harbor" defense.

4

The parties thereafter filed the cross motions for summary judgment that are the basis of this discretionary review. In a hearing on the motions, the trial court ruled that issues of fact remained regarding Liberty Mutual's asserted affirmative defenses. Accordingly, on April 8, 2021, the trial court denied the parties' motions for summary judgment.

Both Schiff and Liberty Mutual filed motions for discretionary review of the trial court's April 2021 orders. Our commissioner granted the parties' motions. The commissioner ruled that, to the extent the parties disagreed regarding the appropriate scope of review, they could present such argument in their merits briefing.

II

Schiff asserts that Liberty Mutual's 80th percentile bill review practice constitutes an unfair practice pursuant to the CPA. This is so, he contends, because the practice violates provisions of the insurance code and regulations promulgated by the insurance commissioner. Liberty Mutual disagrees, asserting that its practice was approved by the Office of the Insurance Commissioner (OIC), and, thus, that this court's Folweiler decision is inapplicable. In addition, Liberty Mutual contends that Schiff has not demonstrated the injury and causation elements of his CPA claim.

Schiff's analysis of the questions presented is the more compelling. The undisputed and pertinent facts indicate that Liberty Mutual's 80th percentile practice is indistinguishable from the practice we held unlawful in the Folweiler decision. Because we also conclude that the additional elements of Schiff's

5

No. 82554-2-I/6

individual CPA claim have been established, Schiff is entitled to summary

judgment for liability on that claim.

A

We review de novo orders on motions for summary judgment, performing

the same inquiry as the trial court. Jones v. Allstate Ins. Co., 146 Wn.2d 291,

300, 45 P.3d 1068 (2002). "All evidence must be considered in the light most

favorable to the nonmoving party, and summary judgment may be granted only

where there is but one conclusion that could be reached by a reasonable

person." Cornish Coll. of the Arts v. 1000 Virginia Ltd. P'ship, 158 Wn. App. 203,

216, 242 P.3d 1 (2010) (citing Lamon v. McDonnell Douglas Corp., 91 Wn.2d

345, 349-50, 588 P.2d 1346 (1979)). Summary judgment is properly granted

when the pleadings, affidavits, depositions, and admissions on file demonstrate

"that there is no genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law." CR 56(c).

B

Washington's CPA makes unlawful "[u]nfair methods of competition and

unfair or deceptive acts or practices in the conduct of any trade or commerce."

RCW 19.86.020. The CPA provides for a private right of action whereby

individual citizens may bring suit to enforce the statute. Hangman Ridge Training

Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 784, 719 P.2d 531 (1986);

RCW 19.86.090. A plaintiff must establish five elements to prevail in a private

CPA action: (1) an unfair or deceptive act or practice, (2) occurring in trade or

commerce, (3) with public interest impact, (4) an injury to the plaintiff's business

6

or property, and (5) causation. Hangman Ridge, 105 Wn.2d at 780. A CPA claim "may be predicated upon a per se violation of statute, an act or practice that has the capacity to deceive substantial portions of the public, or an unfair or deceptive act or practice not regulated by statute but in violation of public interest." Klem v. Wash. Mut. Bank, 176 Wn.2d 771, 787, 295 P.3d 1179 (2013).

An act or practice is per se unfair or deceptive if it violates a statute declaring the conduct to be an unfair or deceptive act or practice in trade or commerce. Hangman Ridge, 105 Wn.2d at 786. However, only an insured may bring a per se action for insurance-related violations of the CPA. Tank v. State Farm Fire & Cas. Co., 105 Wn.2d 381, 394, 715 P.2d 1133 (1986). "If a defendant's act or practice is not per se unfair or deceptive, the plaintiff must show the conduct is 'unfair' or 'deceptive' under a case-specific analysis of those terms." Rush v. Blackburn, 190 Wn. App. 945, 962, 361 P.3d 217 (2015). "Because the act does not define 'unfair' or 'deceptive,'" our Supreme Court "has allowed the definitions to evolve through a 'gradual process of judicial inclusion and exclusion.'" Saunders v. Lloyd's of London, 113 Wn.2d 330, 344, 779 P.2d 249 (1989) (quoting State v. Reader's Digest Ass'n, 81 Wn.2d 259, 275, 501 P.2d 290 (1972)).

> Whether a party in fact committed a particular act is reviewable under the substantial evidence test. However, the determination of whether a particular statute applies to a factual situation is a conclusion of law. Consequently, whether a particular action gives rise to a [CPA] violation is reviewable as a question of law.

Leingang v. Pierce County Med. Bureau, Inc., 131 Wn.2d 133, 150, 930 P.2d 288 (1997). Accordingly, we review de novo whether conduct constitutes an unfair

7

No. 82554-2-I/8

act or deceptive trade practice pursuant to the CPA.  Robinson v. Avis Rent A Car Sys., Inc., 106 Wn. App. 104, 114, 22 P.3d 818 (2001).[5]

"The injury element under the CPA is broadly defined."  Folweiler, 5 Wn. App. 2d at 839.  It is met "upon proof the plaintiff's 'property interest or money is diminished because of the unlawful conduct even if the expenses caused by the statutory violation are minimal.'"  Panag v. Farmers Ins. Co. of Wash., 166 Wn.2d 27, 57, 204 P.3d 885 (2009) (quoting Mason v. Mortg. Am., Inc., 114 Wn.2d 842, 854, 792 P.2d 142 (1990)).  Both pecuniary losses resulting from inconvenience and unquantifiable damages are sufficient.  Panag, 166 Wn.2d at 57-58.  Even "a mere delay in use of property or receiving payment is an injury under the CPA."  Folweiler, 5 Wn. App. 2d at 839.  To demonstrate causation in a CPA claim, the plaintiff must show that the injury was caused "'*by* a violation of RCW 19.86.020.'"  Hangman Ridge, 105 Wn.2d at 793 (quoting RCW 19.86.090).

Mirroring the language of the CPA, our state's insurance code prohibits any person in the business of insurance from engaging in "unfair methods of competition or in unfair or deceptive acts or practices in the conduct of such business," as such acts or practices are defined in regulations promulgated by the insurance commissioner.  RCW 48.30.010(1), (2).  In the insurance regulations, the commissioner has defined several unfair methods of competition and unfair or deceptive acts or practices in the business of insurance, as set forth in WAC 284-30-330.  Starczewski v. Unigard Ins. Grp., 61 Wn. App. 267, 272,

---

[5] Here, the parties have stipulated that there is no dispute of fact regarding Liberty Mutual's challenged conduct.  Thus, whether that conduct constitutes an unfair act or practice "can be decided by this court as a question of law."  Leingang, 131 Wn.2d at 150.

8

810 P.2d 58 (1991). As relevant here, an insurer engages in an unfair claims settlement practice by "[f]ailing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies," WAC 284-30-330(3), or by "[r]efusing to pay claims without conducting a reasonable investigation." WAC 294-30-330(4).[6] Additionally, our state requires automobile insurance policies to offer minimum PIP coverage, including "[m]edical and hospital benefits of ten thousand dollars." RCW 48.22.095(1)(a). "'Medical and hospital benefits' means payments for *all reasonable and necessary expenses* incurred by or on behalf of the insured for injuries sustained as a result of an automobile accident." RCW 48.22.005(7) (emphasis added).

"[Our] legislature has made actions prohibited by the insurance laws subject to the CPA's enforcement provisions." Peoples v. United Servs. Auto. Ass'n, 194 Wn.2d 771, 778, 452 P.3d 1218 (2019) (citing RCW 19.86.170). While exempting from CPA liability some conduct of entities engaged in regulated industries, RCW 19.86.170 explicitly provides "[t]hat actions and transactions prohibited or regulated under the laws administered by the insurance commissioner shall be subject to the provisions of RCW 19.86.020 and all sections of [the CPA] which provide for the implementation and enforcement of RCW 19.86.020." Our Supreme Court has explained that this language "spells out the relationship between the CPA and violations of the insurance code."

---

[6] Schiff also alleged in his complaint that Liberty Mutual's practice violates WAC 284-30-395. However, the standards set forth therein "apply to an insurer's consultation with health care professionals when reviewing the reasonableness or necessity of treatment." WAC 284-30-395. The regulation "applies only where the insurer relies on the medical opinion of health care professionals to deny, limit, or terminate medical and hospital benefit claims." WAC 284-30-395. Thus, it is not applicable here.

Indus. Indem. Co. of the Nw., Inc. v. Kallevig, 114 Wn.2d 907, 921-22, 792 P.2d

520 (1990). "A violation of WAC 284-30-330 constitutes a violation of RCW

48.30.010(1), which in turn constitutes a per se[7] unfair trade practice by virtue of

the legislative declaration in RCW 19.86.170." Kallevig, 114 Wn.2d at 923.

Here, Schiff asserts that Liberty Mutual's 80th percentile practice, relying

solely on its use of the FAIR Health database to determine the reasonableness of

medical provider bills, is an unfair practice pursuant to the insurance regulations

and the CPA. To be clear, Liberty Mutual acknowledges that this practice is its

sole means of determining whether a medical provider's charges are

"reasonable." For instance, by declaration, a claims manager for the insurance

company stated that Liberty Mutual has determined that a "reasonable" charge

for treatment in the relevant policies "will not exceed the 80th percentile of

provider charges" for the same medical billing code and the same geographical

region, as determined using the FAIR Health database. Liberty Mutual does not,

he stated, "manually review each provider's education, credentials, or overhead

costs." In deposition, the claims manager further explained:

> Q. . . . [W]hen the payment is made at the eightieth
> percentile, there's no individualized investigation to the provider's
> fee as to whether it's reasonable or not?
> A. Correct.
> Q. Liberty Mutual doesn't look, for example, at the
> background of the provider, their years of experience or their
> credentials or any of that information to determine whether what
> they're actually charging for the services is reasonable, correct?
> A. That is correct.

---

[7] In Kallevig, an insured sought damages for breach of an insurance contract and violations of the CPA against an insurance company. 114 Wn.2d at 909-10. Because Schiff is not an insured, he may not here bring a per se CPA claim against Liberty Mutual. See Tank, 105 Wn.2d at 394.

No. 82554-2-I/11

Specifically, here, Liberty Mutual has stipulated that it "did not individually investigate Dr. Schiff's background, credentials, board certifications, years of practice, or any other justification for the rates charged by Dr. Schiff" before processing and paying the September 2015 and October 2016 bills. Schiff asserts that, pursuant to our Folweiler decision, Liberty Mutual's conduct constitutes an unfair practice in violation of the insurance regulations and the CPA. Schiff is correct.

C

In Folweiler, we considered the very allegations made here by Schiff. There, Folweiler Chiropractic (Folweiler) filed a class action complaint against American Family, alleging that its practice of utilizing the FAIR Health computer database to assess whether medical provider bills were reasonable, and reducing the amount of those bills pursuant to the 80th percentile of charges, violated the CPA. Folweiler, 5 Wn. App. 2d at 832-33. Folweiler alleged, as Schiff does here, that the insurer's claims settlement process, in failing to "independently evaluate the identity, background, credentials, or experience or any personal characteristic of the individual provider," violated the duty to conduct an individualized assessment. Folweiler, 5 Wn. App. 2d at 838. Thus, Folweiler asserted that the insurer's practice "violated the PIP statute, RCW 48.22.005(7) and RCW 48.22.095, and the regulations defining unfair claims settlement practices in WAC 284-30-330." Folweiler, 5 Wn. App. 2d at 834.

We concluded that RCW 48.22.095(1)(a) and RCW 48.22.005(7) require "an individualized assessment rather than substituting a formulaic approach that

11

pays only 80 percent of the average charge for a large geographic area."

Folweiler, 5 Wn. App. 2d at 838.  In addition, we held that, reading WAC 284-30-

330(3) and (4) together, the regulations "unequivocally establish[] a duty to

actually investigate and conduct a reasonable investigation of claims."  Folweiler,

5 Wn. App. 2d at 839.  This requires, we explained, "an individualized

assessment and not simply applying a geographic based formula to each claim

regardless of the individual circumstances."  Folweiler, 5 Wn. App. 2d at 839.

We concluded that the allegations set forth therein were sufficient to establish an

unfair act in violation of the CPA "based on a violation of the public interest

embodied" in the PIP statutes and insurance regulations.  Folweiler, 5 Wn. App.

2d at 838.

Thus, based on our holding in Folweiler, the statutory and regulatory

authority relied on by Schiff here require "an individualized assessment" to

determine the reasonableness of medical provider bills.  Folweiler, 5 Wn. App. 2d

at 838-39.  A "formulaic approach"—such as the 80th percentile practice

employed by Liberty Mutual—is not alone sufficient.  See Folweiler, 5 Wn. App.

2d at 838-39.  Accordingly, pursuant to our decision in Folweiler, Schiff has

established an unfair practice in violation of the CPA.[8]

---

[8] Liberty Mutual asserts that the procedural posture of the Folweiler case renders our decision inapplicable here.  We disagree.  In Folweiler, we clearly held that the precise practice in which Liberty Mutual is engaged violates the CPA.

We also reject Liberty Mutual's assertion that our Folweiler decision is distinguishable because, here, Liberty Mutual's practice was "approved" by the OIC.  Liberty Mutual submitted to the trial court a declaration of Toni Hood, the deputy insurance commissioner of the legal affairs department of the OIC.  Hood stated therein that Liberty Mutual's practice was approved in OIC filings and complies with WAC 284-30-330.  "This court indeed gives substantial weight to an administrative agency's interpretations in its area of expertise."  Durant v. State Farm Mut. Auto. Ins. Co., 191 Wn.2d 1, 13, 419 P.3d 400 (2018).  Nevertheless, "[w]hile an opinion of the Insurance Commissioner is afforded substantial weight, whether an insurance contract . . .

No. 82554-2-I/13

D

Liberty Mutual asserts, however, that even if its 80th percentile practice constitutes an unfair practice, Schiff cannot demonstrate the injury and causation elements of his CPA claim.[9]  This is so, according to Liberty Mutual, because Schiff cannot demonstrate that the billed amount was "reasonable" and, therefore, that the insurer was required to pay a greater amount than it did.  We disagree.

To establish injury in a CPA claim, "[t]he injury involved need not be great."  Hangman Ridge, 105 Wn.2d at 792.  Somewhat perversely, were we to adopt Liberty Mutual's argument, the insurer would be permitted to rely on its own unlawful conduct to evade liability.  The parties do not dispute that Liberty Mutual paid less than the full amount of the September 2015 and October 2016 charges based on its unlawful use of its 80th percentile practice.  As we did in Folweiler, 5 Wn. App. 2d at 839-40, we conclude that Schiff has established both the injury and causation elements of his CPA claim.

The facts regarding Liberty Mutual's conduct are undisputed.  The insurer relied solely on its 80th percentile practice in declining to pay the charged amounts on two bills submitted by Schiff.  Such conduct constitutes an unfair practice pursuant to the CPA.  Folweiler, 5 Wn. App. 2d at 838-39.  Moreover,

---

violates public policy is ultimately a question of law for the courts."  Leingang, 131 Wn.2d at 154.  There is a difference, however, between deference and fealty.  Moreover, just as took place here, the insurance policy at issue in Folweiler was required to be filed with and approved by the OIC.  See RCW 48.18.100(1).  We decline to overrule our precedent on this basis.

[9] The parties do not dispute that two elements of Schiff's CPA claim—that the practice occurred in trade or commerce and has public interest impact—are met here.  Our decision in Folweiler would foreclose any argument that these elements have not been established.  See 5 Wn. App. 2d at 838-39.

the undisputed facts demonstrate that Schiff has established the remaining elements of his CPA claim. Accordingly, absent any applicable defense, we conclude that Schiff has established CPA liability arising from Liberty Mutual's refusal to pay in full the September 2015 and October 2016 bills.

III

Liberty Mutual asserts that, even if the challenged conduct constitutes an unfair practice, that conduct is exempt from CPA liability pursuant to the statute's regulated industries exemption, RCW 19.86.170. According to Liberty Mutual, because insurers are prohibited from issuing insurance policies prior to obtaining regulatory approval of those policies, conduct arising therefrom is "permitted" pursuant to the CPA's exemption provision. Thus, this argument goes, RCW 19.86.170 exempts any such conduct from CPA liability. This argument, however, is contrary to our legislature's clear mandate—within that very statutory provision—that violations of the insurance regulations are subject to CPA liability. Liberty Mutual's assertion is also contrary to Washington decisional authority interpreting the pertinent statutory provision. Accordingly, we find Liberty Mutual's argument unavailing.

A

Consistent with federal antitrust laws, our legislature "has 'shielded various activities from the rigors of competition' by exempting them from the provisions of the [CPA]." Martha V. Gross, *The Scope of the Regulated Industries Exemption under the Washington Consumer Protection Act*, 10 GONZ. L. REV. 415, 415 (1975) (footnote omitted) (quoting 1955 REPORT OF THE

14

No. 82554-2-I/15

Attorney General's National Committee to Study the Antitrust Laws 261).

The CPA's regulated industries exemption, set forth in RCW 19.86.170, provides in full:

> *Nothing in this chapter shall apply to actions or transactions otherwise permitted, prohibited or regulated under laws administered by the insurance commissioner of this state*, the Washington utilities and transportation commission, the federal power commission or actions or transactions permitted by any other regulatory body or officer acting under statutory authority of this state or the United States: *PROVIDED, HOWEVER, That actions and transactions prohibited or regulated under the laws administered by the insurance commissioner shall be subject to the provisions of RCW 19.86.020 and all sections of chapter 216, Laws of 1961 and chapter 19.86 RCW which provide for the implementation and enforcement of RCW 19.86.020 except that nothing required or permitted to be done pursuant to Title 48 RCW shall be construed to be a violation of RCW 19.86.020*: PROVIDED, FURTHER, That actions or transactions specifically permitted within the statutory authority granted to any regulatory board or commission established within Title 18 RCW shall not be construed to be a violation of chapter 19.86 RCW: PROVIDED, FURTHER, That this chapter shall apply to actions and transactions in connection with the disposition of human remains.
> RCW 9A.20.010(2) shall not be applicable to the terms of this chapter and no penalty or remedy shall result from a violation of this chapter except as expressly provided herein.

RCW 19.86.170 (emphasis added).

The statutory and regulatory context in which the CPA's exemption provision operates is instructive in analyzing its scope. In creating our state's insurance regulatory scheme, "the Legislature and the Insurance Commissioner did not intend to provide protection or remedies for individual interests, but rather only intended to create a regulatory mechanism for the Insurance Commissioner." Escalante v. Sentry Ins. Co., 49 Wn. App. 375, 389, 743 P.2d 832 (1987). Indeed, the purpose of the regulations promulgated by the

15

No. 82554-2-I/16

commissioner is to "define certain minimum standards which, if violated with such frequency as to indicate a general business practice, will be deemed to constitute unfair claims settlement practices." WAC 284-30-300. Violations "may result in the issuance of fines, orders to cease and desist, or suspension or revocation of an insurer's certificate of authority." Escalante, 49 Wn. App. at 389 (citing RCW 48.30.010, RCW 48.05.140(1), WAC 284-30-400). However, neither the insurance code nor the regulations demonstrate an intent to provide for a private cause of action. See RCW 48.30.010, WAC 284-30-400; see also Escalante, 49 Wn. App. at 389-90.

This regulatory scheme confers upon the insurance commissioner less expansive authority than that granted to the utilities and transportation commission and the federal power commission. These public utilities agencies are "charged with administering, in the public interest, pervasive regulatory schemes which affect almost every phase of activity of their respective regulated businesses." Gross, supra, at 423. Their authorizing statutes set forth comprehensive enforcement and remedial provisions, which include the authority to "regulate, restrict, and control the budgets of each company, investigate complaints, award damages to injured consumers and assess penalties against violators." Gross, supra, at 424 (footnotes omitted) (citing RCW 80.04.220, .230, .300-.330, .405). In contrast, "[t]he type of regulation exercised by the insurance commissioner is less comprehensive," including that the commissioner lacks the authority "to assess penalties against violators" or to "require the payment of damages to an injured customer." Gross, supra, at 425.

16

No. 82554-2-I/17

Accordingly, the scope of the immunity provided in the CPA's regulated industries exemption is broader for entities subject to the laws administered by the public utilities agencies than those subject to the laws administered by the insurance commissioner.[10]  Whereas the primary exemption provision exempts from liability "actions or transactions otherwise permitted, prohibited or regulated under laws administered by" any of these agencies, RCW 19.86.170 also includes a proviso applicable solely to entities subject to regulation under the insurance code.  This proviso, the first proviso of the statute, states

> [t]hat actions and transactions prohibited or regulated under the laws administered by the insurance commissioner shall be subject to the provisions of RCW 19.86.020 and all sections of chapter 216, Laws of 1961 and chapter 19.86 RCW which provide for the implementation and enforcement of RCW 19.86.020 except that nothing required or permitted to be done pursuant to Title 48 RCW shall be construed to be a violation of RCW 19.86.020.

RCW 19.86.170.

Thus, while "[i]nsurers enjoy the same broad exemption as public utilities for those actions which would otherwise violate [RCW] 19.86.030-.060," "the exemption for violations of [RCW] 19.86.020 is limited to those actions *required or permitted* to be done pursuant to [the insurance code]."[11]  Gross, supra, at 425 (emphasis added).  In other words, as to those actions regulated by the

---

[10] See Gross, supra, at 423 (explaining that the "exemption categories" in RCW 19.86.170 "reflect the federal scheme of allowing highly regulated industries a broader immunity from liability under the Act" and that "[t]he degree, nature and purposes of agency control of each exemption category provide clues as to the parameters of the exemption provided under each category").

[11] RCW 19.86.020 declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  The CPA additionally makes unlawful agreements and conspiracies to restrain trade, monopolies and attempted monopolies, transactions and contracts that lessen competition, and stock acquisitions to lessen competition.  RCW 19.86.030-.060.

17

No. 82554-2-I/18

insurance commissioner that would otherwise violate RCW 19.86.030-.060, the insurance commissioner has "exclusive" authority, whereas the commissioner has "concurrent [authority] with the courts" over actions that would violate RCW 19.86.020.[12]  Gross, supra, at 425-26.  Indeed, in promulgating the applicable regulations, the insurance commissioner employed language that "precisely echoes the language of the CPA."  Blaylock v. First Am. Title Ins. Co., 504 F.Supp.2d 1091, 1098 (W.D. Wash. 2007).  See RCW 19.86.020 (declaring unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices"); WAC 284-30-330 (defining "unfair methods of competition and unfair or deceptive acts or practices of the insurer in the business of insurance").

Thus, our legislature, cognizant that the insurance code provides no remedy for consumers when an insurer violates its provisions, provided for such a remedy in RCW 19.86.170.  See State v. Conte, 159 Wn.2d 797, 808, 154 P.3d 194 (2007) (recognizing that "the legislature is 'presumed to have full knowledge of existing statutes affecting the matter upon which they are legislating'" (internal quotation marks omitted) (quoting Martin v. Triol, 121 Wn.2d 135, 148, 847 P.2d 471 (1993))).  Consistent with this legislative intent, Washington courts have

---

[12] The law review article cited discusses the authority of the commissioner and the courts as jurisdictional.  See Gross, supra, at 425 (explaining that the insurance commissioner has "exclusive jurisdiction" regarding violations of RCW 19.86.030-.060 and "concurrent jurisdiction with the courts" regarding violations of RCW 19.86.020).  Whether a court has subject matter jurisdiction in a matter "is often confused with a court's 'authority to rule in a particular manner,' leading to 'improvident and inconsistent use of the term [jurisdiction].'"  In re Marriage of McDermott, 175 Wn. App. 467, 480, 307 P.3d 717 (2013) (internal quotation marks omitted) (quoting Marley v. Dep't of Labor & Indus., 125 Wn.2d 533, 539, 886 P.2d 189 (1994)).  "Superior courts are granted broad original subject matter jurisdiction by Wash. Const. art. IV, § 6," discretion that "'cannot be whittled away by statutes.'"  McDermott, 175 Wn. App. at 481 (quoting Shoop v. Kittatas County, 108 Wn. App. 388, 396, 30 P.3d 529 (2001)).  Here, the correct terminology in discussing whether the lawfulness of actions is determined by the commissioner or the courts is "authority," not "jurisdiction."

No. 82554-2-I/19

repeatedly held that violations of the insurance regulations are subject to our consumer protection law.[13] Indeed, quoting the first proviso of RCW 19.86.170, our Supreme Court has determined that the legislature "expressly provided that violations of the insurance regulations are subject to the CPA." Kallevig, 114 Wn.2d at 922. There, the court rejected the argument that, because the insurance code provision defining unfair or deceptive acts or practices was enacted prior to the enactment of the CPA, a violation of that statute does not afford CPA liability. Kallevig, 114 Wn.2d at 925. In so doing, the court reasoned that adopting such an argument would "eviscerate the plain language of RCW 19.86.170 which makes RCW 48.30.010 subject to the CPA." Kallevig, 114 Wn.2d at 926; see also Leingang, 131 Wn.2d at 152 ("The general rule is that violations of insurance regulations are subject to the Consumer Protection Act.").

However, in addition to providing that violations of the insurance regulations are generally subject to the CPA, the first proviso also carves out its own exception—that "nothing *required or permitted* to be done pursuant to Title 48 RCW" is a violation of RCW 19.86.020. RCW 19.86.170 (emphasis added). Thus, "actions and transactions prohibited or regulated" under the insurance code are subject to liability pursuant to RCW 19.86.020, but those "required or permitted" by the code are exempt from such liability. RCW 19.86.170. It is this statutory language on which Liberty Mutual relies in asserting that its challenged

---

[13] See, e.g., Perez-Cristanos v. State Farm Fire & Cas. Co., 187 Wn.2d 669, 685, 389 P.3d 476 (2017); Courchaine v. Commonwealth Land Title Ins. Co., 174 Wn. App. 27, 45, 296 P.3d 913 (2012); Van Noy v. State Farm Mut. Auto. Ins. Co., 98 Wn. App. 487, 496, 983 P.2d 1129 (1999); Urban v. Mid-Century Ins., 79 Wn. App. 798, 805-06, 905 P.2d 404 (1995); Kallevig, 114 Wn.2d at 921-23.

19

No. 82554-2-I/20

conduct is exempt from the general rule of liability for violations of RCW 19.86.020.

B

According to Liberty Mutual, its 80th percentile practice is set forth in the insurance policy that it submitted to the OIC for regulatory approval pursuant to RCW 48.18.100. That statute provides that "[n]o insurance policy form . . . may be issued, delivered, or used unless it has been filed with and approved by the commissioner." RCW 48.18.100(1). The OIC's approval of the policy, Liberty Mutual contends, constitutes "permission" pursuant to the insurance code to engage in the challenged practice. We disagree.

Washington decisional authority forecloses Liberty Mutual's proposed interpretation of RCW 19.86.170. Moreover, even were the regulatory approval of an insurance policy sufficient to exempt from liability the insurer's actions pursuant to that policy, the specificity of "permission" required for exemption exceeds that found here. Finally, Liberty Mutual's interpretation of RCW 19.86.170 would exempt broad swaths of insurer conduct from CPA liability, in direct contravention of our legislature's express intention that such conduct be subject to our state's consumer protection law. For each of these reasons, we decline to adopt Liberty Mutual's reading of the CPA's exemption provision.

1

As an initial point, we have previously rejected the contention that the first proviso of RCW 19.86.170 exempts from CPA liability alleged violations arising from individual insurance contracts. Rounds v. Union Bankers Ins. Co., 22 Wn.

20

No. 82554-2-I/21

App. 613, 615, 590 P.2d 1286 (1979).  In that case, the parents of an insured child alleged fraud and bad faith of an insurance sales agent for inducing the parents to subscribe to insurance that did not provide coverage for the child's actual condition by intentionally misnaming the condition.  Rounds, 22 Wn. App. at 614.  The parents sought, among other remedies, an award of treble damages pursuant to the CPA.  Rounds, 22 Wn. App. at 614.  We noted that our Supreme Court had previously held that the CPA's protections applied in breach of duty to use good faith and fair dealing cases with private individuals, as "a private insurance contract affects the public interest."  Rounds, 22 Wn. App. at 615.  However, prior to our decision in Rounds, no Washington court had considered an insurer's contention "that RCW 19.86.170 expressly exempts actions arising from individual insurance contracts from the Act's application."  22 Wn. App. at 615.  Applying the principles of statutory construction, we rejected this contention: "Recognizing the general purposes of the Consumer Protection Act and the insurance code, and reading and considering them together, we find no difficulty in concluding that the legislative intent was to provide a remedy for an insured who suffers due to conduct such as [the insurer's] alleged actions."  Rounds, 22 Wn. App. at 616.[14]

---

[14] In all relevant respects, the version of RCW 48.18.100 in effect when we issued the Rounds decision is the same as the version of the statute applicable here.  See former RCW 48.18.100(1) (1947).  Accordingly, as here, the insurance policy at issue in Rounds was required to have been "filed with and approved by the commissioner" prior to issuance.  Former RCW 48.18.100(1) (1947).

21

In addition, our Supreme Court has declined to determine that insurers are exempt from CPA liability merely because the OIC has approved the insurance policy language pertinent to the alleged violation. See Durant v. State Farm Mut. Auto. Ins. Co., 191 Wn.2d 1, 12-13, 419 P.3d 400 (2018). In Durant, the insureds alleged that State Farm's use of the maximum medical improvement (MMI) standard violated insurance regulations and the CPA. 191 Wn.2d at 7. Throughout its briefing to the court, State Farm "relie[d] on the assertion that its auto policy containing the MMI provision has been repeatedly approved by the OIC." Durant, 191 Wn.2d at 12. The insurer therein urged the court to "defer to the OIC's expertise on the issue." Durant, 191 Wn.2d at 12-13. Of note, however, the OIC had submitted an amicus brief stating that it had informed the insurer that the policy provision violated the insurance regulations. Durant, 191 Wn.2d at 13. In deciding the case, as relevant here, the court declined to hold that the OIC's approval of an insurance policy shielded the insurer from liability for actions engaged in pursuant to that policy.

Similarly, a federal district court in Washington has rejected the contention that an insurer's submittal of title insurance rates for OIC review exempts the insurer from liability premised on the rates charged.[15] Blaylock, 504 F.Supp.2d 1091. The insureds therein alleged that, in violation of Washington's insurance code and regulations, First American paid inducements to lenders, real estate agents, and others to obtain their referrals. Blaylock, 504 F.Supp.2d at 1094.

---

[15] Federal court decisions applying the CPA are not binding on this court; however, they provide guiding authority. Panag, 166 Wn.2d at 47.

First American asserted that its conduct was exempt from CPA liability pursuant to the first proviso of RCW 19.86.170. Blaylock, 504 F.Supp.2d at 1104. It argued that, because its rates were submitted to the insurance commissioner, and because it was required to charge only the rates filed, the "act of charging the filed rates cannot be construed to be a violation of the CPA." Blaylock, 504 F.Supp.2d at 1104.

In rejecting that contention, the district court held that the insurer had "misconstrue[d] the conduct being challenged"—it was the unfair and deceptive expenditures, not the rates charged, that was at issue. Blaylock, 504 F.Supp.2d at 1104. Thus, the challenged conduct was not "'required or permitted to be done'" under the insurance code, but instead was "specifically prohibited." Blaylock, 504 F.Supp.2d at 1104 (quoting RCW 19.86.170).

In addition, the court further held that, even if it construed the challenged conduct as the insurer urged, RCW 19.86.170 would still not exempt that conduct from liability. Blaylock, 504 F.Supp.2d at 1105. "Washington courts," the district court noted, "have long interpreted [RCW] 19.86.170 to shield only conduct affirmatively authorized by the agency," not conduct "that is merely acquiesced to by a regulatory agency." Blaylock, 504 F.Supp.2d at 1104. Because the insurance code did not require the OIC to review title insurance rates prior to approval, this "superficial review" did not indicate that the agency had "given its 'specific permission,' or executed any 'overt affirmative act' of approval."[16] Blaylock, 504 F.Supp.2d at 1105.

---

[16] The statute relied on by the insurer therein provides that each title insurer must "file with the commissioner a schedule showing the premium rates to be charged by it" and that

23

The same is true here.  Although no Washington court has concluded that an insurer's conduct was "permitted" under the first proviso of RCW 19.86.170, the scope of such permission has been defined in the context of the exemption's other provisions.[17]  Our Supreme Court has held that an agency must take "overt affirmative actions specifically to permit the actions or transactions" engaged in by the regulated entity.  In re Real Est. Brokerage Antitrust Litig., 95 Wn.2d 297, 301, 622 P.2d 1185 (1980).  Indeed, the exemption provision "does not exempt actions or transactions merely because they are regulated generally.  [It] applies only if the particular practice found to be unfair or deceptive is specifically permitted, prohibited or regulated."  Vogt v. Seattle-First Nat'l Bank, 117 Wn.2d 541, 552, 817 P.2d 1364 (1991).  Here, of course, where the challenged practice is subject to the laws administered by the insurance commissioner, the particular practice must be not only "regulated," but specifically "required or permitted to be done" pursuant to the insurance code, for the exemption to apply.  See RCW 19.86.170 (first proviso).

---

additions or modifications of the schedule "shall likewise be filed with the commissioner, and no such addition or modification shall be effective until expiration of fifteen days after [the] date of such filing."  RCW 48.29.140(2).  See Blaylock, 504 F.Supp.2d at 1096 ("Although the rates are submitted, and the Commissioner has 15 days in which review could occur before the rates go into effect, the Code does not actually mandate review.").

[17] Liberty Mutual asserts that our Supreme Court's decision in Washington Osteopathic indicates that "[t]he safe harbor [provision] applies to practices approved by the OIC."  Br. of Appellant/Cross-Resp't at 38 (citing Wash. Osteopathic Med. Ass'n v. King County Med. Serv. Corp., 78 Wn.2d 577, 580, 478 P.2d 228 (1970)).  However, that case is inapposite.  There, an osteopathic medical association and its members alleged a conspiracy to exclude osteopathic physicians and surgeons from participating in a plan for prepaid medical and health care.  Wash. Osteopathic, 78 Wn.2d at 578.  The plaintiffs characterized the defendants' activities "as being in restraint of trade (RCW 19.86.030), monopolistic (RCW 19.86.040), and in violation of the act's prohibition against tying agreements (RCW 19.86.050)."  Wash. Osteopathic, 78 Wn.2d at 578.  They did not allege violation of RCW 19.86.020.  Accordingly, the activities challenged there were not subject to the first proviso of the CPA's exemption provision, which applies only to violations of RCW 19.86.020.  See RCW 19.86.170.  Here, Schiff alleges violation of RCW 19.86.020, and, thus, the first proviso of the exemption provision applies.

No. 82554-2-I/25

Contrary to Liberty Mutual's assertion, the OIC's approval of the insurance policy does not constitute specific permission to engage in the particular practice challenged by Schiff. The statute on which Liberty Mutual relies provides that "[n]o insurance policy form . . . may be issued, delivered, or used unless it has been filed with and approved by the commissioner." RCW 48.18.100(1). Thus, the only specific action permitted by the statute is, following approval by the commissioner, the issuance, delivery, or use of the insurance policy. Our legislature has made clear its mandate that courts "liberally construe the CPA so that 'its beneficial purposes may be served.'" Robinson, 106 Wn. App. at 111 (quoting RCW 19.86.920). Accordingly, we "narrowly construe the scope of the exemption provisions of the CPA." Robinson, 106 Wn. App. at 111.[18] As our Supreme Court has recognized, "[o]verly broad construction of 'permission' may conflict with the Legislature's intent that the Consumer Protection Act be liberally construed so that its beneficial purposes may be served." Vogt, 117 Wn.2d at 552. Reading RCW 48.18.100(1) to specifically permit not only the issuance of an insurance policy, but also any conduct engaged in by the insurer premised upon that policy's language, would contravene our legislature's clear mandate.

Furthermore, the plain language of RCW 48.18.100 undermines Liberty Mutual's contention that the regulatory approval of an insurance policy necessarily demonstrates that the OIC has deemed lawful each provision of that policy. Instead, as in Blaylock, 504 F. Supp. 2d at 1102-03, 1105, RCW

---

[18] Further evidencing its intent that the exemption provisions of the CPA be narrowly construed, our legislature has twice amended the exemption provision to narrow the scope of the immunity provided for therein. See Gross, supra, at 433.

25

No. 82554-2-I/26

48.10.100 allows for default policy approval. The statute distinguishes between policy filings that contain "a certification" and those that do not. When the filing contains "a certification, in a form approved by the commissioner, . . . attesting that the filing complies with [the insurance code and regulations]," it may be used by the insurer "immediately after filing with the commissioner." RCW 48.18.100(2). However, if the filing does not contain a certification, it must be submitted to the commissioner "not less than thirty days in advance of issuance, delivery, or use." RCW 48.18.100(3). Affirmative approval by the OIC is not required. Rather, "[a]t the expiration of the thirty days, the filed form shall be deemed approved unless prior thereto it has been affirmatively approved or disapproved by order of the commissioner." RCW 48.18.100(3).[19] Such "[m]ere nonaction" does not constitute specific permission as required by the exemption provision. In re Real Est. Brokerage Antitrust Litig., 95 Wn.2d at 301.[20]

3

Additionally, even were the OIC's approval of an insurance policy sufficient to constitute "permission" pursuant to the exemption provision, the policy language approved here does not describe the specific challenged

---

[19] The commissioner may also extend the period for an additional fifteen days. In such circumstances, "[a]t the expiration of the period that has been extended, and in the absence of prior affirmative approval or disapproval, the form shall be deemed approved." RCW 48.18.100(3).

[20] Liberty Mutual does not indicate whether the relevant policy here has been "certified" by the OIC pursuant to RCW 48.18.100(2). The insurer has, however, provided a declaration by an OIC deputy commissioner stating that its 80th percentile practice comports with the applicable regulations. This does not, in any event, change our analysis, as we hold that any such approval pursuant to RCW 48.10.100 does not constitute permission for purposes of the exemption provision.

26

No. 82554-2-I/27

practice. The pertinent policy language, set forth in the 2006 policy,[21] provides

that "reasonable expenses" means "the least of:"

> 1. The actual charge;
> 2. The charge negotiated with a provider; or
> 3. The charge determined by us *based on a methodology using a database* designed to reflect amounts charged by providers of medical services or supplies within the same or similar geographic region.

(Emphasis added.)

Schiff's contention is that Liberty Mutual's 80th percentile practice violates

the insurance regulations because the insurer *relies solely on* the FAIR Health

database to determine the reasonableness of a medical provider's bills. While

the policy language submitted for OIC approval indicates that Liberty Mutual may

determine "reasonable expenses" *based on* such a methodology, it does not

indicate that the insurer will determine reasonableness *solely* on this basis. Even

were the OIC's regulatory approval sufficient to shield an insurer from CPA

liability, this policy language would not meet the specificity required for the

challenged practice to be "permitted" pursuant to the CPA's exemption provision.

See, e.g., Vogt, 117 Wn.2d at 552 (holding that the "particular practice" must be

found to be "specifically permitted"); Dick v. Att'y Gen., 83 Wn.2d 684, 688, 521

P.2d 702 (1974) (holding that the "particular practice," not just the business

generally, must be found to be regulated for the exemption to apply); Singleton v.

Naegeli Reporting Corp., 142 Wn. App. 598, 611, 175 P.3d 594 (2008) (holding

---

[21] Liberty Mutual asserts that the language of the 2016 policy, which more specifically identifies its 80th percentile practice, is relevant to whether the OIC's regulatory approval constitutes permission to engage in that practice. However, Schiff's patients were treated, and Liberty Mutual was billed, pursuant to the terms of the 2006 policy. In any event, for the reasons set forth above, regulatory approval of language describing even the precise practice would not exempt Liberty Mutual from liability for engaging in an unlawful practice.

that, because the pertinent regulation did not address "paragraphing and tabbing" in deposition transcripts, the changes made to the transcripts were not specifically permitted).

Furthermore, were the submission of an insurance policy to the OIC pursuant to RCW 48.18.100 sufficient to exempt insurers from CPA liability for actions arising under that policy, consumer protections against unfair and deceptive acts and practices in the insurance industry would be eviscerated. Absent few exceptions, all insurance policies issued in our state must be "filed with and approved by the commissioner," RCW 48.18.100(1), even if such policies are ultimately "deemed approved" by default. RCW 48.18.100(3). Adopting Liberty Mutual's preferred reading of RCW 19.86.170 would thus contravene our legislature's mandate that the exemption provisions of the CPA be narrowly construed. See Robinson, 106 Wn. App. at 111. Similarly, such an interpretation would undermine the authority of Washington courts to determine the lawfulness of insurance industry practices, contrary to the legislature's intent in enacting the CPA's regulated industries exemption. See Gross, supra, at 425 (noting that, pursuant to the language of RCW 19.86.170, the commissioner and the courts have "concurrent" authority over actions that would violate RCW 19.86.020). Finally, adopting Liberty Mutual's reading of the exemption provision would induce instability into a stable area of the law. For each of these reasons, we reject Liberty Mutual's assertion that its conduct is exempt from CPA liability pursuant to RCW 19.86.170.

28

In summary, Liberty Mutual's contention that it is shielded from CPA liability due to the OIC's approval of the pertinent insurance policy is unavailing. In enacting the first proviso of RCW 19.86.170, our legislature, cognizant of the limitations of the insurance regulatory scheme, clearly intended to subject insurers to CPA liability for violations of RCW 19.86.020. Consistent with the legislative mandate that CPA exemptions be narrowly construed, Washington courts have repeatedly held that insurers are subject to liability for such violations. Indeed, this court has rejected the contention "that RCW 19.86.170 expressly exempts actions arising from individual insurance contracts" from CPA liability. Rounds, 22 Wn. App. at 615. As a matter of law, Liberty Mutual's challenged conduct is subject to the CPA.

IV

Liberty Mutual next contends that Schiff's claim is barred because, due to the OIC's regulatory approval of the relevant insurance policy, Liberty Mutual had a "good faith" belief that it was acting in compliance with the law. Schiff, however, does not allege that Liberty Mutual acted in bad faith in denying insurance coverage. Moreover, no decisional authority supports Liberty Mutual's contention that a purported "good faith" defense could be premised on the regulatory approval of an insurance policy. Because nearly all insurance policies must be so approved, such a defense would contravene our legislature's clear intent that insurers be subject to CPA liability for violation of the insurance regulations. Accordingly, we reject Liberty Mutual's assertion.

No. 82554-2-I/30

1

It is well-established that an insurer's reasonable conduct in denying insurance coverage does not constitute an unfair act or practice.  See, e.g., Kallevig, 114 Wn.2d at 916-17 (in evaluating whether conduct constituted a bad faith denial of coverage, holding that "an insurer's denial of coverage, without reasonable justification, constitutes bad faith"); Villella v. Pub. Emps. Mut. Ins. Co., 106 Wn.2d 806, 821, 725 P.2d 957 (1986) (where an insurer's investigation was reasonable, holding that "[a] denial of coverage, although incorrect, based on reasonable conduct of the insurer does not constitute an unfair trade practice"); Castle & Cooke, Inc. v. Great Am. Ins. Co., 42 Wn. App. 508, 518, 711 P.2d 1108 (1986) (holding that the insured was required to show that the insurer acted in bad faith in denying coverage and that "[a] denial of coverage based on a reasonable interpretation of the policy is not bad faith"); Felice v. St. Paul Fire & Marine Ins. Co., 42 Wn. App. 352, 361, 711 P.2d 1066 (1985) (where the insured asserted a bad faith denial of coverage, holding that "[d]enial of coverage due to a debatable question of coverage . . . is not bad faith giving rise to a [CPA] violation").  Indeed, "a reasonable basis for denial of an insured's claim constitutes a complete defense to any claim that the insurer acted in bad faith or in violation of the [CPA]."  Dombrosky v. Farmers Ins. Co. of Wash., 84 Wn. App. 245, 260, 928 P.2d 1127 (1996).

Our Supreme Court has also held that "[a]cts performed in good faith under an arguable interpretation of existing law do not constitute unfair conduct violative of the [CPA]."  Leingang, 131 Wn.2d at 155.  There, the insured

30

No. 82554-2-I/31

asserted that the insurer failed to make a good faith investigation into the legal validity of an uninsured motorist exclusion. Leingang, 131 Wn.2d at 154-55. The court determined that the insurer "was relying on a reasonable interpretation of existing law" in asserting that the exclusion was valid, as "*at least four trial courts' and two Court of Appeals' decisions*" in our state had held that the exclusion was "clear and enforceable and not against public policy." Leingang, 131 Wn.2d at 155 (emphasis added). Thus, the court determined that there was no evidence to support a finding of an unfair or deceptive act. Leingang, 131 Wn.2d at 156.

We have since repeatedly relied on the court's holding in Leingang, in each instance when determining whether an insurer's *denial of coverage* was reasonable. Shields v. Enter. Leasing Co., 139 Wn. App. 664, 667, 161 P.3d 1068 (2007) (holding that an insurance company did not have a duty to provide third party liability coverage to renters who expressly rejected the option to purchase that coverage); Seattle Pump Co. v. Traders & Gen. Ins. Co., 93 Wn. App. 743, 753, 970 P.2d 361 (1999) (holding that "[a]n insurer's denial of coverage on the ground that the policy was cancelled prior to the loss is not unreasonable" and did not violate the CPA); Capelouto v. Valley Forge Ins. Co., 98 Wn. App. 7, 22, 990 P.2d 414 (1999) (where the insured asserted bad faith and CPA claims, concluding that there was no indication that the insurer acted in bad faith or without reasonable justification in denying the claims).

2

Liberty Mutual asserts herein that, because the OIC approved the relevant insurance policy pursuant to RCW 48.18.100, it was acting "in good faith under

31

an arguable interpretation of existing law." Thus, according to Liberty Mutual, it is immune from CPA liability even if its conduct constitutes an unfair practice. We disagree.

First, Washington courts consider an insurer's "good faith" in the context of an insured's claim that the insurer acted in bad faith or otherwise acted unreasonably when denying insurance coverage. See, e.g., Leingang, 131 Wn.2d at 154-55; Kallevig, 114 Wn.2d at 916-17; Villella, 106 Wn.2d at 821; Shields, 139 Wn. App. at 667; Seattle Pump Co., 93 Wn. App. at 753; Capelouto, 98 Wn. App. at 22; Castle & Cooke, Inc., 42 Wn. App. at 518; Felice, 42 Wn. App. at 361. Here, Schiff asserts neither that Liberty Mutual acted in bad faith nor that it denied insurance coverage. Rather, Schiff asserts that Liberty Mutual's payment of less than the full amount billed, pursuant to its 80th percentile practice, is an unfair practice pursuant to the CPA. "Value disputes are not coverage denials." Lock v. Am. Fam. Ins. Co., 12 Wn. App. 2d 905, 926, 460 P.3d 683 (2020). We are not persuaded that we should extend the application of the so-called "good faith" defense beyond the context of allegations of bad faith denial of coverage.

Moreover, decisional authority does not support Liberty Mutual's contention that the regulatory approval of an insurance policy is sufficient to establish immunity from a CPA claim. In Leingang, the insurer's "good faith" was pertinent to the claim that it had failed to make a good faith investigation into the legal validity of an insurance policy exclusion. 131 Wn.2d at 154-55. Moreover, therein, "at least four trial courts' and two Court of Appeals' decisions" had held

32

No. 82554-2-I/33

that the exclusion was valid and did not violate public policy. Leingang, 131

Wn.2d at 155. Unlike multiple trial court and appellate court decisions, the

regulatory approval of an insurance policy—approval that is required for the

issuance of nearly every such policy—does not establish "existing law" on which

Liberty Mutual could, in "good faith," rely.[22]

Liberty Mutual's contention that it should be shielded from liability due to

its "good faith" belief that it was complying with "existing law" is clearly contrary to

our state's decisional authority. However, additionally, we are cognizant of the

practical consequences of holding that the regulatory approval of insurance

policies insulates insurers from CPA liability. Again, because nearly every

insurance policy issued in our state must receive such regulatory approval, see

RCW 48.18.100(1), adopting Liberty Mutual's argument would preclude nearly all

CPA actions arising from an insurer's conduct under its policies. Such shielding

of insurers from CPA liability would directly contravene our legislature's clear

mandate that violations of the insurance regulations are subject to the CPA.

RCW 19.86.170. See also Leingang, 131 Wn. 2d at 152; Kallevig, 114 Wn.2d at

922. Moreover, holding that the OIC's approval of insurance policies insulates

insurers from CPA liability would undermine the authority of Washington courts to

---

[22] Liberty Mutual's reliance on our Supreme Court's decision in Perry is similarly unavailing. See Perry v. Island Sav. & Loan Ass'n, 101 Wn.2d 795, 810, 684 P.2d 1281 (1984). There, a homeowner contended that a bank attempted to enforce a due-on-sale clause with full knowledge that the clause was unenforceable. Perry, 101 Wn.2d at 810. Our Supreme Court, however, concluded that "resolution of [that] issue involved some complexity" and involved questions "of first impression" in the court. Perry, 101 Wn.2d at 810. The court thus determined that the bank's attempt to enforce the clause "was done in good faith under an arguable interpretation of existing law." Perry, 101 Wn.2d at 810. It concluded that "[s]uch conduct in a single case attempting to determine the legal rights and responsibilities of both parties should not be considered 'unfair' in the context of the consumer protection law." Perry, 101 Wn.2d at 810 (emphasis added). Perry is inapposite here.

33

determine the lawfulness of insurers' conduct. In enacting RCW 19.86.170, our legislature clearly intended that Washington courts possess and exercise such authority.

Accordingly, we hold that there is no "good faith" defense against CPA liability for an insurer based on the regulatory approval of the insurance policy pursuant to which it acted. Such a holding would contravene Washington decisional authority and our legislature's clear intent that insurers are subject to CPA liability under RCW 19.86.020 for violations of the insurance code and regulations. Thus, the trial court erred by denying Schiff's motion for summary judgment regarding Liberty Mutual's purported "good faith" defense.

V

Schiff has established that Liberty Mutual's 80th percentile practice constitutes an unfair practice pursuant to the CPA. Schiff has additionally established the other four elements of his CPA claim. Liberty Mutual is incorrect that it is shielded from liability for its unlawful conduct based on the CPA's exemption provision or a purported "good faith" affirmative defense. Accordingly, we reverse the trial court's denial of Schiff's motion for summary judgment, and we affirm the trial court's denial of Liberty Mutual's motion for summary judgment.[23]

---

[23] Schiff additionally requests that we grant injunctive relief precluding Liberty Mutual from continuing to engage in the challenged practice. However, the trial court has ruled, on at least two occasions, that Schiff's claim for injunctive relief is barred by the Froeber settlement. Schiff did not seek discretionary review of those rulings; nor does he provide argument regarding why we should now review the trial court's January 2020 and June 2020 orders.

"Upon accepting discretionary review, an appellate court may specify the issue or issues as to which review is granted." RAP 2.3(e). In other words, we may determine the scope of discretionary review. City of Bothell v. Barnhart, 156 Wn. App. 531, 538 n.2, 234 P.3d 264 (2010), aff'd 172 Wn.2d 223, 257 P.3d 648 (2011). Here, a commissioner of our court ruled that,

No. 82554-2-I/35

Affirmed in part, reversed in part, and remanded.

WE CONCUR:

---

to the extent the parties disagreed on the appropriate scope of review, they could present argument on that matter in their merits briefing. Although Schiff presents argument regarding why, in his view, we should grant injunctive relief, he nowhere presents argument regarding why we should grant review of the trial court's January 2020 and June 2020 orders.

The parties sought discretionary review only of the trial court's April 2021 orders. In so doing, they sought to "materially advance the ultimate termination of the litigation." RAP 2.3(b)(4). We need not address the trial court's injunctive relief rulings in order to decide the issues on which discretionary review was granted; nor need we do so in order to materially advance the ultimate termination of this litigation. Accordingly, in exercising our discretion to determine the scope of discretionary review, we decline to review the trial court's rulings regarding Schiff's injunctive relief claims.